UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ADRIAN JONES,

       Plaintiff,                         Case No. 11-cv-15330

                                        Paul D. Borman
v.                                     United States District Judge

                                        Mona K. Majzoub
CITY OF WARREN, and               United States Magistrate Judge
Warren Police SERGEANT
JEFFREY PIEROG, and Warren
Police OFFICER JOHNSON in
their Individual and Official
Capacities, Jointly and Severally,

       Defendants.
_____/

OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 24)

      Before the Court is Defendants City of Warren, Warren Police Sgt. Jeffrey Pierog, and Warren Police Officer Johnson's Motion for Summary Judgment. (ECF No. 24.) Plaintiff filed a Response (ECF No. 29) and Defendants filed a Reply (ECF No. 30). The Court held a hearing on March 27, 2014. For the reasons that follow, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion.

**INTRODUCTION**

      Plaintiff Adrian Jones a/ka/ Mike ("Jones") was arrested on September 27, 2010, during a controlled drug buy of prescription pain pills. When Jones realized that the sale was a sting, he fled and attempted to scale a concrete/brick block wall. Jones was grabbed from the wall by an officer and wrestled to the ground. During the course of the arrest, one of the arresting officers used his

1

taser in drive stun mode on Jones's lower left side when Jones refused to comply with the officers's commands that he give them his hands for handcuffing. Also, during the course of Jones's attempt to flee and his subsequent arrest, Jones's patellar tendon was ruptured. Jones now brings this § 1983 action against City of Warren Police Officers Jeffrey Pierog and Shawn Johnson, claiming that the officers used excessive force by unnecessarily tasing Jones and by stomping on his knee and rupturing his patellar tendon.[1]

The officers respond that use of the taser was necessary to obtain Jones's compliance in their efforts to handcuff him and deny that any officer "stomped" on Jones's knee or otherwise landed a gratuitous blow to Jones's leg. The officers argue that, in any event, they are entitled to qualified immunity because their conduct did not violate clearly established law regarding the use of a taser and because no record evidence supports Jones's claim that his patellar tendon was ruptured by one of the officers "stomping" on his leg.

## I. BACKGROUND

On September 27, 2010, undercover Warren Police Department Officer Richard Schnur placed a phone call to Jones to set up a controlled drug buy of prescription painkillers at the McDonald's restaurant at Twelve Mile and Mound roads in Warren, Michigan. (ECF No. 24, Defs.' Mot. Ex. 1, Warren Police Department Incident Report 3.) When Officer Schnur gave the signal, Defendants Sergeant Jeffrey Pierog and Officer Shawn Johnson moved in to arrest Jones. (*Id.*) When Pierog and Johnson announced themselves as police officers, Jones ran from them, through

---

[1] Plaintiff did not respond to, and has abandoned and conceded his claims against the City of Warren and his claim of deliberate indifference. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.") (Collecting cases).

an adjoining parking lot, ignoring the officers's commands to drop to the ground and submit to arrest. In his effort to evade arrest, Jones attempted to climb and/or jump over a solid block wall that was approximately 6-8 feet high . (ECF No. 24, Defs.' Mot. Ex. 1, Warren Police Department Incident Report 3; Ex 3, May 14, 2012 Deposition of Jeffrey Pierog 44-47; Ex. 4, May 14, 2012 Deposition of Shawn Johnson 21-24; Ex. 5, April 17, 2012 Deposition of Adrian Jones 38-41.) As Jones began to run into an adjoining parking lot, Officer Johnson advised Jones that he would be tased if he continued to resist arrest. (Incident Report 3; Johnson Dep. 23-24; Pierog Dep. 51.) Jones continued to flee and as Jones was in the process of attempting to scale the wall, Johnson deployed his taser but it did not penetrate Jones's clothing and did not stop him. (Incident Report 3; Johnson Dep. 23-24; Pierog Dep. 50.)

The Incident Report explains that next "PO Johnson and Sgt. Pierog were forced to take Jones to the ground to avoid him from jumping off the brick wall." (Incident Report 3.) Johnson and Pierog testified that it was Officer Johnson who pulled Jones off of the wall by grabbing Jones's upper body and pulling Jones to the ground. (Johnson Dep. 23-24; Pierog Dep. 47-49.) According to Johnson and Pierog, both Johnson and Jones fell backward off the wall and onto the ground, with Johnson landing on the ground on his back and Jones landing on his back on top of Officer Johnson, Johnson's arms wrapped around Jones's upper body. (Johnson Dep. 23-24; Pierog Dep. 47-49.) Jones does not recall how he got off of the wall, only that he landed on the ground and ended up on his back with his arms crossed on his chest. Jones's glasses had fallen off in the process. (Jones Dep. 42-43.) Officer Johnson testified that when he and Jones landed on the ground, he rolled Jones off of him and onto the ground. (Johnson Dep. 25-26.)

Jones testified that he was on the ground on his back with his arms folded across his chest.

3

He refused Officer Pierog's command to him to roll over and told the officers to roll him over themselves. (Johnson Dep. 43, 46; Pierog Dep. 49; .) This is consistent with the Incident Report which indicates "[o]nce on the ground Jones rolled over onto his back and clenched his arms across the front of his body ignoring officers orders to lay face down and place his hands behind his back." (Def.'s Mot. Ex. 1, Incident Report 3.) This is also consistent with Officer Pierog's testimony that when he approached Jones he was on his back and "had his hands and he wouldn't, you know," and at that time Pierog told Officer Johnson "we got to roll him over." (Pierog Dep. 49.) Jones was not struggling or threatening officers but refused to roll over. (Johnson Dep. 28, 60; Pierog Dep. 49, 54.)

Jones claims that while he was on his back refusing commands to roll over, one of the officers said, "You like to run. I'll fix that," and then "stomped" on Jones's left knee with what felt like a "soft bottomed shoe." (Jones Dep. 47-49, 59-61, 63-65.) Jones states that he immediately felt "an excruciating pain" in his knee that he had not felt before the officer stomped on it. (Jones Dep. 63.) Both Johnson and Pierog deny that the comment about Jones "liking to run" and "I'll fix that" was made and deny that anyone "stomped" on Jones's knee or leg. (Johnson Dep. 34; 57-58; Pierog Dep. 84-87.) Pierog testified that he was undercover that day and was wearing shorts and either construction boots or tennis shoes. (Pierog 36.) Johnson testified that he was in uniform and was wearing black leather boots. (Johnson 43.)

The officers rolled Jones onto his stomach and Jones then refused to give up his hands from under his body so that officers could place him in handcuffs, offering what the officers termed as "passive resistance" through the dead weight of his body lying on top of his crossed arms. (Johnson Dep. 28, 32-34; Pierog Dep. 49-51, 76-77.) Pierog was situated above Jones's upper body focused

4

on Jones's head and hands and unsuccessfully trying to free his arms and Johnson was situated on and above Jones's lower body/legs. (Pierog Dep. 77-80; Johnson Dep. 31.) Officer Johnson observed Officer Pierog struggling with both of his arms to get Jones's hands from under his body. (Johnson 31-32.) Johnson warned Jones that if he didn't give up his hands, Johnson would deploy his taser. (Johnson Dep. 32; Pierog Dep. 77.) Jones did not comply, Pierog continued to struggle to free his hands and Officer Johnson administered a single five second drive stun with his taser to Jones's left leg area near his buttocks. (Incident Report at 3, PgID#110; Pierog Dep. 49-50; Johnson Dep. 32.). Jones was immediately compliant, offered his hands and was handcuffed. (Johnson Dep. 33-34; Pierog Dep. 49-50.) Jones denies an awareness of having been tased and denies feeling a shock from the taser to his lower left side. (Jones Dep. 50.) Jones only recalls having his knee "stomped on" before officers rolled him over. (*Id*. at 48-49.)

After handcuffing Jones, Officer Pierog, assisted by Officer Sauger, a uniformed officer who had arrived on the scene and who later transported Jones to the booking station, lifted Jones up off on the ground. (Pierog Dep. 51-53, 56.) Jones complained that he could not walk due to the pain in his knee. Officer Pierog and Officer Sauger noticed at that time that Jones's pants were bloodstained at the knee. (Pierog Dep. 52; August 13, 2012 Deposition of Michael Sauger 25.) Thinking it inappropriate to take down Jones's pants in the McDonald's parking lot, the officers carried him to the car, placed him in the patrol car and Sauger drove him to the station. (Sauger Dep. 25-28; Pierog Dep. 51-53, 56-57.) Once there, they immediately looked at Jones's knee and called the fire department to transport him to the hospital for treatment. (Sauger Dep. 29-30; Pierog Dep. 66-69; Jones Dep. 56-57.) Pierog and Johnson had no further contact with Jones after he was transported from the station. Jones began receiving medical treatment within thirty minutes of his

5

arrest. (Defs.' Mot. Ex. 1, Incident Report at 4; Def.'s Mot. Ex. 7, Warren Fire Department PCR Run Report.) Jones was diagnosed with an acute ruptured patellar tendon and on September 28, 2010, underwent a surgical repair of his left patellar tendon, as well as the medial and lateral retinaculum, performed by Dr. Ferras Zeni, M.D. (Defs.' Mot. Ex. 8, Independent Medical Exam (IME) Report of Ronald S. Lederman 2.)

On September 12, 2012, Jones submitted to an independent medical exam by Dr. Ronald Lederman, M.D. who opined that "being stomped on would not be a mechanism of injury for an open patellar tendon rupture." (Defs.' Mot. Ex. 8, Lederman IME Report 6.) On July 15, 2013, Dr. Zeni, the orthopaedic surgeon who performed Jones's patellar tendon repair, submitted an Affidavit in which he opined that patellar tendon ruptures do not typically break the skin and that the open wound that accompanied Jones's patellar tendon rupture would have required a direct force to have been applied to the knee. (ECF No. 31, April 3, 2013 Affidavit of Ferras Zeni, M.D. ¶¶ 3-4.) Dr. Zeni further opined that having his knee "stomped on" was a possible contributing mechanism for Jones's injury. (*Id.* ¶ 5.) Plaintiff's October 1, 2010 Discharge Summary following his surgery and hospitalization noted two possible causes of a patellar tendon rupture: "Sudden episode of stressful over activity, such as with jumping, hurdling, or starting a sprint," or "Direct blow or injury to the knee." (ECF No. 29-11, Discharge Summary Documents.)

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order. Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no

genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial.... In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.' Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)).

### III. ANALYSIS

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, alleging that Pierog and Johnson violated his constitutional right to be free from excessive force in tasing him to gain his cooperation in handcuffing him and in "stomping on" his knee.[2] Claims regarding an officer's use of excessive force in the context of an arrest or other seizure are governed by the Fourth Amendment: "Where,

---

[2] At the hearing on Defendants' motion, Plaintiff's counsel conceded that the "primary focus" of Plaintiff's excessive force claim was the alleged stomping on Plaintiff's knee.

as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 394 (1989). The determination as to whether the officer has exerted excessive force during the course of a seizure is determined under an "objective reasonableness" standard. *Id.* at 396-97. "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. The Court analyzes the challenged conduct from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

In analyzing the claim, the Court must pay "careful attention to facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The inquiry necessarily entails balancing individual rights with governmental interests:

> Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or an investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

490 U.S. at 396-397 (internal quotation marks and citations omitted).

Civil liability will not attach, however, simply because an officer's conduct may be found

to have violated one or more of a plaintiff's constitutional rights. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, __U.S.__, 131 S.Ct. 2074, 2080 (2011). A court need not address these two inquiries in any particular order, and may choose first to determine whether a right was clearly established before deciding whether an officer's conduct on a particular occasion violated that right. *Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009). "A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of the right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 131 S.Ct. at 2083 (internal quotation marks and citation omitted).

### A. The Knee Stomp[3]

It is well established in the Sixth Circuit that the gratuitous use of force on a suspect who has been fully subdued is constitutionally excessive. *See, e.g., Harris v. City of Circleville*, 583 F.3d

---

[3] The Court is aware that "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). In this case, Plaintiff lost his glasses in the course of the arrest and testified that he was unable to see which of the two officers allegedly stated "You like to run, I'll fix that," and then stomped on his knee. There is no dispute that both Officers Pierog and Johnson were actively involved in subduing Plaintiff after Johnson pulled him down off of the wall. Pierog gave the order to Jones to roll over and Johnson was close by, having just rolled Jones off of Johnson's chest and onto the ground. Accordingly, genuine issues of fact remain as to whether one or both officers were actively involved in the alleged act of excessive force or at a minimum able to act to prevent it. *Binay*, 601 F.3d at 651. *See also Cole v. City of Dearborn*, 448 F. App'x 571, 576-77 (6th Cir. 2011) (holding that plaintiff, who was on his stomach at the time of the alleged acts of excessive force and therefore could not identify which officer(s) had committed the acts, created a genuine issue of fact as to each officer "who could not be identified by plaintiffs but was present and could have been involved in the application of excessive force" such that a reasonable juror could conclude that either or both were "personally involved in the alleged excessive force").

10

356, 367 (6th Cir. 2009) ("it is clearly established in this circuit that the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional") (internal quotation marks and citation omitted). Defendants do not seriously dispute that if one of the Defendant officers had "stomped on" Jones's knee while he lay on the ground passively resisting verbal commands, such conduct would constitute unnecessarily gratuitous and constitutionally excessive force. *See* Sauger Dep. 35-37. Officer Johnson testified that Jones posed no threat to the officers that day and that there would have been no reason to cause him any physical harm. (Johnson Dep. 60.) The factual dispute in this case is not whether a "knee stomp" under these circumstances would constitute excessive force but whether such force was in fact used.

Defendants argue that Jones's version of events surrounding the rupture of his patellar tendon are wholly unsupported by the record and should be rejected by the Court as "blatantly contradicted by the record." It is well accepted that when one version of events is blatantly contradicted by other record evidence, a court must disregard the contradicted facts for purposes of summary judgment. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (noting that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment," and finding that video of car chase blatantly contradicted plaintiff's version of events and that the district court "should have viewed that facts in the light depicted by the videotape"); *Austin v. Redford Twp. Police Dept*, 690 F.3d 490, 493 (6th Cir. 2012) ("Although we must view the facts as assumed by the district court, to the extent this version of the event is "blatantly contradicted" by videotaped evidence, we must "view[] the facts in the light depicted by the videotape") (quoting *Scott, supra*); *Khother v. DeEulis*, 527 F. App'x 461, 462-63 (6th Cir. 2013)

11

(drawing all inferences in plaintiff's favor but adopting the facts as presented in a video that blatantly contradicted plaintiff's allegation that his head was slammed into the booking desk). This case, however, does not involve video or audio evidence – it involves conflicting factual accounts by Jones on the one hand and the arresting officers on the other.

There is no dispute that Jones's patellar tendon was intact before he began to flee from the undercover agents. There is likewise no question that the tendon ruptured at some point during the arrest and before Jones got up off of the ground after having been handcuffed. Jones's testimony is that while he was on his back refusing to roll over, one of the officers stated, "You like to run, I'll fix that," and stomped on his knee with what felt like a soft bottomed shoe causing him to feel a sharp excruciating pain in his left leg. Specifically, Jones testified as follows: "I felt a sharp, thrusting pain. Whatever mannerism or however it was delivered, I can't say if it was – I don't know what a foot – how you could describe what a foot may feel like or even if it was an object. I – I don't know." (Jones Dep. 60.) Jones concedes that he lost his glasses in the struggle with officers and did not actually see which one of the officers "stomped" on his knee.

Defendants argue that the sharp pain that Jones felt was likely due to the drive stun deployed by Officer Johnson to Jones's left lower back and leg area when they were trying to administer handcuffs and that Jones likely ruptured his tendon earlier trying to scale the block wall in his effort to flee. But Jones testified he felt no pain in his knee while trying to climb the wall and felt no pain when he was first lying on the ground on his back. Jones testified that the "I'll fix that" remark was made and followed immediately by the stomp *before* he was rolled over onto his stomach. The officers testified that the drive stun was delivered after Jones had been rolled over, while Jones was on his stomach, his hands tucked under his body, and Pierog was trying to pry them from underneath

Jones. Johnson and Pierog, not surprisingly, deny that either of them said "You like to run, I'll fix that," or stomped on Jones's knee. But Jones's testimony was clear that moments before he felt the excruciating pain in his knee, and just before being rolled over onto his stomach, one of the officers uttered the gratuitous remark and then delivered the blow. The Defendants' speculation about what might have caused Jones's pain does not render Jones's testimony "blatantly contradicted" by the record such that the Court can completely disregard his testimony in favor of the officers's version of events. These factual inconsistencies preclude the Court's finding as a matter of law that no reasonable juror could conclude that the "knee stomp" actually occurred as Jones described.

Conflicting affidavits from the surgeon who repaired Jones's tendon and the IME doctor, opining as to possible mechanisms of injury for Jones's patellar tendon rupture, muddy the waters on the cause of the rupture but do not preclude a finding of fact on this issue. Dr. Lederman, the IME doctor, opines that being stomped on would not be a mechanism of injury for an open patellar tendon rupture. The literature that Jones attaches to his response discusses different mechanisms of injury for a patellar tendon rupture indicating that jumping or a direct blow to the knee could have been the cause. (Pl.'s Resp. Ex. 11.) Dr. Zeni points out in his Affidavit that the open nature of the wound is more consistent with a blow than with a spontaneous rupture due to a jumping action. But the Court need not address the Zeni Affidavit or the IME doctor's report because the October 1, 2010 Discharge Summary, explaining that a patellar tendon rupture can result from either a sudden episode of spontaneous activity or from a direct blow to the knee, is sufficient in this case to support Plaintiff's argument that there is a genuine issue of material fact regarding the possible mechanism of injury of his patellar tendon rupture. This is sufficient to send this question to a jury. In this situation, the Court is obligated to leave the resolution of this factual dispute to the trier of fact,

whose charge it is to judge the credibility of the witnesses and to weigh their conflicting factual accounts or expert opinions of how it may be that Jones's patellar tendon came to be ruptured in the course of his arrest.[4]

### B. Johnson's Use of His Taser to Deliver a Single Five Second Drive Stun

As of September 27, 2010, it was clearly established in the Sixth Circuit that the use of a taser on a non-resistant person who poses no threat of escape or of causing immediate harm violated clearly established law. *See Bennett v. Krakowski*, 671 F.3d 553, 561 (6th Cir. 2011) ("'[A]bsent some compelling justification—such as the potential escape of a dangerous criminal or the threat of immediate harm—the use of [a stun gun] on a non-resistant person is unreasonable'") (second alteration in original) (quoting *Kijowski v. City of Niles*, 372 F. App'x 595, 600 (6th Cir. April 8, 2010) (holding that "[a]bsent some compelling justification-such as the potential escape of a dangerous criminal or the threat of immediate harm-the use of such a weapon on a non-resistant person is unreasonable")). *But see Caie v. West Bloomfield Twp.*, 485 F. App'x 92, 96 (6th Cir. 2012) (recognizing that *Kijowski* established that use of a taser on a non resistant person who poses no threat of escape or harm was objectively unreasonable but finding officer's single use of taser in drive stun mode on suspect who had attempted to flee and was failing to cooperate with officer's efforts to apply handcuffs did not constitute excessive force); *Williams v. Ingham*, 373 F. App'x. 542, 548 (6th Cir. 2010) (finding that officers acted reasonably by tasing suspect who would not move his hands from under his body). The Sixth Circuit has recently summarized the law relating

---

[4] In reaching its conclusion that summary judgment is not appropriate and that genuine issues of material fact remain, the Court has not relied on and expresses no opinion on the admissibility of any of the materials, reports or affidavits submitted by the parties on the issue of the mechanism of injury. The Court finds that the October 10, 2010 hospital Discharge Summary, standing alone, is sufficient to support a finding of a genuine issue of material fact on the issue of proximate cause.

to the objective reasonableness of the use of tasers in the context of a handcuffed suspect:

> [T]his circuit's "prior opinions clearly establish that it is unreasonable to use significant force on a restrained subject even if some level of passive resistance is presented." *Meirthew v. Amore*, 417 Fed.Appx. 494, 499 (6th Cir. 2011) (emphasis added) (finding excessive force when an officer attempting to search a handcuffed but still belligerent suspect used an arm-bar takedown to bring her to the ground). This is especially true when the suspect is already handcuffed. *See Michaels v. City of Vermillion*, 539 F.Supp.2d. 975, 985 (N.D. Ohio 2008) (noting the "well-established" rule that "the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional" and collecting this circuit's cases to that effect (internal quotation marks omitted)). And there are a number of cases explicitly addressing the illegality of using "non-lethal, temporarily incapacitating force [such as a taser] on a handcuffed suspect who no longer poses a safety threat, flight risk, and/or is not resisting arrest." *Id*. at 985–86 (collecting cases).

*Wells v. City of Dearborn Heights*, 538 F. App'x 631, 638 (6th Cir. 2013).

In this case, Jones was not handcuffed at the time that Officer Johnson made the decision to deploy his taser in drive stun mode. Jones was lying on the ground face down and was described by officers as "passively resistant," using his body weight to prevent officers from freeing his hands to secure the handcuffs. Jones, by his own admission, refused to cooperate with officers' commands that he surrender his hands for handcuffing and resisted the officers' physical efforts to free his arms from under his body. Johnson warned Jones that if he didn't cooperate, he would be tased. Johnson then administered a single drive stun,[5] and Jones, according to his own testimony, did not even

---

[5] TASER is an acronym created by the NASA scientist who created the taser to "[pay] homage to a book by the Stratemeyer Syndicate, published under the pseudonym Victor Appleton, titled *Tom Swift and His Electric Rifle, or, Daring Adventures in Elephant Land* (1911), where Tom Swift hunted wildlife on the African savannah with an electric rifle he invented." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 492 n. 3 (6th Cir. 2012). The taser has two modes, "dart mode" or "drive stun mode." *Id*. at 492. In "dart" or "probe" mode, the gun propels a pair of barbed darts that penetrate the person's skin and override the central nervous system, causing "excruciating pain that radiates throughout the body," paralyzing the person and rendering them "limp and helpless." *Id*. In "drive-stun" mode, used by Officer Johnson on Jones, the darts are removed and the contacts on the gun are placed directly on the victim, delivering an electric shock but not overriding the nervous

15

know that he had been tased.

In considering whether Johnson's delivery of a single drive stun was objectively reasonable, the Court looks to the totality of the circumstances surrounding the arrest. Just moments before the drive stun was administered, Jones had been actively fleeing from officers, refusing commands to stop and submit to arrest, necessitating that officers physically wrestle him to the ground to prevent his escape. These facts must be considered in determining whether Officer Johnson's decision to deploy his taser was objectively reasonable under the circumstances. Under *Graham*, the actions of the officers must be judged from the perspective of a reasonable officer on the scene and must take into consideration "the facts and circumstances of [the] particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396 (citations omitted and alteration added).

Some factors in this case suggest that tasing may not have been necessary - Jones had committed a non-violent crime and was only "passively" resisting officers with his own body weight and refusal to cooperate. On the other hand, although somewhat subdued at the moment that he was tased, he had been actively attempting to flee, refusing all commands given by the arresting officers and was not yet handcuffed or under complete control. It is worth observing that deploying a single drive stun was (a) immediately effective and (b) could have been less likely to result in injury to Jones than using even greater physical force to pry Jones's arms from under his body, which may have resulted in any number of physical injuries, from a separated shoulder to a broken arm, given Jones's resistance to the handcuffing. As the Sixth Circuit noted in *Hagans v. Franklin County*

---

system as in dart mode. *Id*. *See also* Johnson Dep. at 44-45.

*Sheriff's Office*, 695 F.3d 505 (6th Cir. 2012), the line between resistance and non-resistance is not easily defined and sometimes deploying a taser is the least forceful means available to an officer to obtain the compliance of an uncooperative suspect:

> This line between suspects who actively resist arrest and those who comply with officers' commands may or may not hold as to the ultimate constitutional question. The taser remains a relatively new technology, and courts and law enforcement agencies still grapple with the risks and benefits of the device. Even as of a year ago, however, it could be said that tasers carry "a significantly lower risk of injury than physical force" and that the vast majority of individuals subjected to a taser—99.7%—suffer no injury or only a mild injury. John H. Laub, Director, Nat'l Inst. of Justice, Study of Deaths Following Electro Muscular Disruption 31 (2011).

695 F.3d at 510. *See also Devoe v. Rebant*, No. 05-71863, 2006 WL 334297, at *6-7 (E.D. Mich. Feb. 13, 2006) (finding a single drive stun to handcuffed suspects lower back after he refused multiple times to get into the police car did not constitute excessive force); *Alexander v. City of Shelby Twp.*, No. 07-cv-14741, 2009 WL 3241974, at *2 (E.D. Mich. Oct. 8, 2009), (finding use of taser objectively reasonable where handcuffed suspect ignored multiple requests to enter the patrol car).

In this case, when the drive stun was delivered, Jones had not yet been handcuffed and was resisting officers' efforts to apply them. While the extent of Jones's "resistance" in this case at the time that Officer Johnson made the decision to deploy his taser in drive stun mode gives the Court pause in finding that use of the taser was objectively reasonable under the circumstances, "[t]he essence of qualified immunity . . . is to give government officials cover when they resolve close calls in reasonable (even if ultimately incorrect) ways." *Id*. at 511. As the Sixth Circuit recognized in *Caie*, the fact that a previously resistant arrestee may have been "subdued" does not necessarily make the officer's use of his taser constitutionally excessive:

> Moreover, the fact that Plaintiff was taken to the ground and arguably "subdued"

17

> when Tilli employed the taser does not, as Plaintiff argues, compel the conclusion that Tilli's use of force was unreasonable. Although Plaintiff insists that he no longer posed a risk of harm or flight after being taken to the ground, there is no dispute that Plaintiff continued to be uncooperative by actively resisting the officers' attempts to secure his arms behind his back. In light of this resistance, we find that Tilli's single use of the taser in drive-stun mode was not gratuitous.

485 F. App'x at 96-97. Although Jones may not have been resisting the officers' efforts to handcuff him as actively as the suspect was in *Caie*, there is no dispute that he was openly refusing to cooperate with efforts to gain control over his hands. The officers could not have known with certainty what Jones may have had beneath his body. *See Williams*, 373 F. App'x at 548 (finding that officers were objectively reasonable in delivering a drive stun to arrestee who had attempted to flee by giving chase in his car and, after having been wrestled to the ground, refused to remove his hands from under his body to permit officers to handcuff him). Jones's acts of resistance must be viewed in light of the fact that Jones had just attempted to sell narcotics to undercover officers and then ran from officers after they announced themselves, ignoring threats that he would be tased and attempted to scale a seven foot brick wall to evade arrest.

Jones argues that the officers should have used "soft empty hand control" to Jones's passive resistance offered only by his "dead weight." (ECF No. 29, Pl.'s Resp. 9.) But in arguing this point, Jones is treating the tasing and the alleged knee stomp as a single event of force. But they must be analyzed separately. While it is easy to say in hindsight that the taser should not have been deployed and that the officers should have just forced his arms from underneath his body and handcuffed him, from the officers' descriptions, Pierog was struggling with Jones and prying his arms from beneath him was not so easily accomplished. The single drive stun was quick, efficient and likely less traumatic to Jones than further escalating the physical efforts to overcome Jones's resistance to permitting his hands to be cuffed behind his back.

18

This is a close case. But as the Sixth Circuit recognized in *Hagans*, "close calls" merit the protection of qualified immunity:

> [T]hese factors must be assessed together with, not apart from, the reality that Hagans was out of control and continued forcefully to resist arrest. As the district court recognized, the combination of factors presented Officer Ratcliff with a "close call," R. 63 at 14, as some factors cut in favor of using the taser while other factors cut against it. The essence of qualified immunity, however, is to give government officials cover when they resolve close calls in reasonable (even if ultimately incorrect) ways. *See al-Kidd*, 131 S.Ct. at 2085. The fact remains that, prior to May 2007 (and for several years after), no case in any circuit held that officers used excessive force by tasing suspects who were actively resisting arrest, even though many of them, like Hagans, were suspected of innocuous crimes, posed little risk of escape and had not yet physically harmed anybody.

*Hagans*, 695 F.3d at 510-11. The same is true here because, at the very least, "the law governing the use of a taser to gain an arrestee's compliance with police officer commands [on September 27, 2010 was] hazy." *Alexander*, 2009 WL 3241974, at *2.

Under the totality of the circumstances, the Court concludes that a reasonable officer in Johnson's position would not have known on September 27, 2010, that a fleeing suspect who has just completed a controlled drug buy and who refuses commands to halt despite being warned he would tased, who then attempts to scale a seven foot brick wall in an effort to evade arrest and must be physically taken to the ground, who then continues to refuse officers' commands to cooperate and refuses to free his arms for handcuffing despite warnings that he would be tased if he failed to cooperate, had a clearly established right not to be tased with a single drive stun in order to gain his compliance. Accordingly, Officer Johnson (and Officer Pierog to the extent there was any suggestion that he could have intervened) is entitled to qualified immunity on Plaintiff's claims with respect to Officer Johnson's single use of his taser in drive stun mode to gain Plaintiff's compliance with orders that he surrender his hands for handcuffing.

## IV.     CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion as to Officers Pierog and Johnson as it relates to the use of the taser and DENIES Defendants' motion as to Officers Pierog and Johnson as it relates to the claimed stomping on Jones's knee and alleged resulting patellar tendon rupture. The Court further GRANTS Defendants' motion to dismiss the City of Warren and GRANTS Defendants' motion to dismiss any claim against any of the Defendants based upon an alleged deliberate indifference to medical needs. This case shall proceed to trial against Officers Pierog and Johnson on the single claim related to the alleged knee stomp and resulting injury.

IT IS SO ORDERED.

 s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: April 15, 2014

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 15, 2014

s/Deborah Tofil
Case Manager